Madden, Judge,
dissenting:
Our case involves the legal obligations of a tenant who-has leased property by a lease containing a covenant to restore the property, at the end of the lease, to the same condition as at the beginning, ordinary wear and tear excepted. I *175 think the lessor may not be left in the position where, in, order to have the use of the same facilities which he had before the beginning of the lease, he must spend his own money to reconstruct them. For example, in the instant case, there-were in place, at the beginning of the lease, 450 storm sash on the large windows of the main factory building. The United States during its tenancy, discarded 375 of these-storm sash. The cost of replacing them would have been more than $27,000. The judgment of the court gives the-plaintiff $5,000 for the destruction of this property. Whether this means that the court has concluded that the placing of" storm sash on these windows would be practically useless, an almost total economic waste, we are not told. There is no-evidence upon which the court could have based such a conclusion. Nothing that we judicially know about New England winters or the price of fuel would justify such a conclusion.
If it be urged that the plaintiff should recover, not the cost of new storm windows, but the value of the old ones when-the Government destroyed them, and that the plaintiff did" not offer evidence of that value, I think that position is not well taken. The storm sash were in place and in usable condition at the beginning of the tenancy. Their second-hand! value would have been substantially zero. The Government destroyed them, so that it cannot replace them. It will cost - the plaintiff $27,000 to have storm windows usable and in place. I know of no other way to fairly measure the plain- - tiff’s damage. I think my tenant cannot put me in the position where if I take a little of his money and add to it a lot more of my own money I can again have a front door or storm, windows on my house. If my old front door or storm windows have to be replaced by costly new ones, that is a result' which the tenant could have avoided by not destroying my. old ones.
I think the evidence leaves no room for doubt that if the-floors in the pickerhouse and the storehouse were in place, as they were at the beginning of the tenancy, the rental value-of those buildings would be substantially increased. All the floor space available has been in good demand at profitable - rates of rent. But instead of awarding the plaintiff the- *176 amount, something over $100,000, that it would cost to replace the floors, the court has awarded $12,000.
One of the Government’s experts, Mr. Drew, testified that these buildings were worth as much with the floors out as with the floors in. This testimony was given in the face of the fact that the removal of the floors reduced the floor space in the storehouse from 30,000 square feet to 7,500 square feet, and in the pickerhouse from 16,272 square feet, in addition to the basement, to 8,100 square feet. Space in the building where there were several floors was renting readily at prices averaging about 35 cents per square foot per year.
The Government’s other expert, Mr. Scrivner, testified that each of these buildings would have been worth about $6,000 more with the floors in than they were with the floors out. But the difference in rents in a single year would come close to the $12,000 difference in capital value to which he testified.
What the court has really done, it seems to me, is to set off the improvements which the Government has made in the plaintiff’s property against the gaps which have been left by the failure to restore. The court has not been consistent in doing this, or it would not have awarded the plaintiff anything at all. One must concede that there is a certain rough justice in this process of setoff. My objection to it is that I think it is not the law.
FINDINGS OP PACT
The court, having considered the evidence, the report of Commissioner William E. Day, and the briefs and argument of counsel, makes findings of fact as follows:
1. The plaintiff is a corporation organized and existing under the laws of the State of Rhode Island, having its principal place of business at Lonsdale, in the town of Cumberland, Rhode Island. It was formed to buy real estate in the State of Rhode Island.
2. By this action the plaintiff seeks to recover the costs of restoration of certain property which had been leased by the defendant, acting through the Navy Department, from the plaintiff’s predecessor in title and as to which the defendant had during the tenancy made certain substantial *177 alterations. There is also a claim for unpaid rent which the defendant says was tendered after a deduction had been made for certain utilities and heat furnished to the plaintiff by the defendant.
3. Early in 1948, the defendant proceeded by condemnation in the United States District Court for the District of Rhode Island against 47.8 acres of land, more or less, in Lonsdale, Cumberland, Providence County, Rhode Island, for the purpose of acquiring title to the land together with improvements consisting in the main of a large old former cotton textile mill and appurtenant buildings known as the Ann & Hope Mill.
4. As a consequence of the institution of the condemnation action described above, negotiations were had between the owner, Edward A. McNulty of Pawtucket, Rhode Island, and representatives of the defendant, resulting in a lease of the property, the title of which had been sought by the condemnation action which was thereafter dismissed. The property included in the lease consisted of four parcels as follows:
Parcel 1 — a tract of 12.3 acres on which the mill buildings were located.
Parcel 2 — an adjacent tract of 35.5 acres of land.
Parcel 3 — an adjacent tract of 4.45 acres of land.
Parcel 4 — an adjacent tract, the extent of which is not shown by the record.
5. The lease of parcels 1, 2, 3,. and 4 from McNulty to the defendant was dated May 22, 1943. By the terms of the lease, the premises were to be used for the purpose of a construction equipment repair depot and storage space. The term of the lease was to begin on May 22, 1943, and to end June 30, 1944, with the right of cancellation on 30 days’ notice and the option on the part of the defendant to renew from year to year upon 30 days’ written notice to the lessor.
The lease provided in part as follows:
6. The Lessor shall furnish to the Government, during the occupancy of said premises, under the terms of this lease, as part of the rental consideration, the following: NOTHING.
7. The Government shall pay the Lessor for the premises rent at the following rate: Twenty-five Thousand *178 Dollars per annum ($25,000). Payment shall be made, at the end of each month.
8. The Government shall have the right, during the existence of this lease, to make alterations, attach fixtures, and erect additions, structures, or signs, in or upon the premises hereby leased (provided such alterations, additions, structures, or signs shall not be detrimental to or inconsistent with the rights granted to, other tenants on the property or in the building in which said premises are located) ; which fixtures, additions, or structures so placed in or upon or attached to the said premises shall be and remain the property of the Government and may be removed therefrom by the. Government prior to the termination of this lease, and the Government, if required by the Lessor, shall, before, the expiration of this lease or renewal thereof, restore the premises to the same condition as that existing at the time of entering upon the same under this lease, reasonable and ordinary wear and tear and damages by the elements or by circumstances over which the. Government has no control, excepted: Provided, however, that if the Lessor requires such restoration, the. Lessor shall give written notice thereof to the Government fifteen (15) days before the termination of the, lease.
9. The Lessor shall, unless herein specified to the contrary, maintain the said premises in good repair and' tenantable condition during the continuance of this, lease, except in case of damage arising from the act or the negligence of the Government’s agents or employees. For the purpose of so maintaining the premises, the Lessor reserves the right at reasonable times, to enter and inspect the premises and to make any nec-. essary repairs thereto.
* * * ¡s *
12. It is specifically understood and agreed that the. Government shall pay only the water charges and that aU other charges such as taxes and insurance will be. paid by the owner.
This lease has been negotiated in settlement of con-, demnation proceedings entitled United States vs. 47.8; acres of land, more or less, in Lonsdale, Cumberland^ Providence County, Rhode Island, and Mack Construe-' tion Company et al — Mise. No. 212.
6. While the lease was still in force, by reason of renewals, McNulty, by deed dated February 28, 1946, for a consideration of $807,500, conveyed to the plaintiff that portion. *179 of tlie leased property containing 12.3 acres of land together with the mill buildings located thereon described in finding 4 as parcel 1. The deed provided in part as follows:
This conveyance is also made subject to an outstanding lease to the present occupant, namely, United States of America and recorded in the Becords of Land Evidence in the Town of Cumberland, Bhode Island.
McNulty, on February 28, 1946, also executed an assignment of his right, title and interest in and to the lease between him and the United States referred to in finding 5. The assignment contained the following provision, among others:
This assignment is subject to the understanding that if the United States of America shall give up full possession and interest in parcel one (1) which is mentioned and described in description attached to said lease, and cancel their right to possession and any interest in said parcel one (1) that the said Bealty Associates Inc. shall not be entitled to any rent that may be payable thereafter by virtue of any letting by the undersigned to the United States of America of parcels two (2) and three (3) mentioned and described in the afore-' said description attached to said lease; but that otherwise the full rental payable by the United States of America under the terms of said lease shall belong to Bealty Associates, Inc., its successors and assigns, without limitation or restriction.
7. The lease from McNulty had in the meantime been renewed for the period from July 1, 1944, through June 30, 1946. After the execution of the deed from McNulty to the plaintiff, a further renewal notice was sent to McNulty for another year beginning July 1, 1946, and ending June 30, 1947.
8. At the time the premises were leased by the United States in May 1943, they consisted of slightly more tba.n 51.25 acres of land on which was situated a group of 12 buildings, known as the Ann & Hope Mill. The location, size, description, and identification of the buildings are shown on a diagram and perspective drawing which was made January 14, 1922, pursuant to a'survey for insurance purposes. The main mill buildings, known as buildings *180 Nos. 1 and 2, run roughly north and south. Building No. 1 contains four stories and a basement, and building No. 2 contains two stories and a basement. Both buildings are of brick mill construction with a tar and gravel roof.
Building No. 1 is 498 feet long and 101 feet wide. Building No. 2 is 501 feet long and 102 feet wide, but building No. 2 also has two additions of 17 feet and 56 feet respectively. These additions are shown on the insurance map as buildings Nos. 6. and 7:
Buildings Nos. 1 and 2 each have a tower adjoining them. The towers, which jut out from the face of the mill on the west, are 26 feet by 28 feet and are auxiliary to the buildings, merely containing stairs, utilities and toilet facilities. To the east and rear of buildings Nos. 1 and 2 are three towers similar to those in the front of the buildings. Building No. 6, adjoining the main buildings Nos. 1 and 2, has a sawtooth roof. The rest of the building has a normal industrial tar and gravel roof. Buildings Nos. 4 and 5, which lie to the east of the main mill buildings, about halfway from the north end of Building No. 1, are of heavy brick construction, building No. 5 having originally been a boilerhouse. That building is 86 feet by 42 feet. It immediately adjoins the former rollershop, building No. 4, which is of similar heavy construction, 72 feet by 49 feet.
To the east of the north end of building No. 1 and removed therefrom some little distance, is building No. 10, which at one time also was a boiler and power house.
To the east of the center of the main mill lies building No. 3, described as the pickerhouse. This building is of heavy masonry and brick construction and originally was a two-story and basement building. To the south of building No. 3 is the building referred to as the storehouse. This building is 150 feet by 50 feet, with a stone base on the south and east sides and the remainder of heavy brick construction. Originally it was a three-story and basement building.
The four-story portion of the main mill building (No. 1), the rollershop (No. 4), the boilerhouse (No. 5), and the wastehouse (No. 9), were constructed in 1886. The two-story portion of the main mill building (No. 2), the picker-house (No. 3), the storehouse and the addition (No. 7), were constructed in 1901.
*181 9. The Ann & Hope Mill was designed and constructed for use as a cotton mill. Originally the drive shafts were located in the basement of the main mill buildings (Nos. 1 and 2), and power to operate the textile machinery on the upper floors of those buildings was supplied by belts which extended through openings cut in the floors and connected with the drive shafts in the basement and the machinery on the floors above the drive shafts.
10. The Lonsdale Company, which built the Ann & Hope Mill, operated it as a cotton mill from 1886, when it was built, until it was closed down in 1934. The premises remained vacant until they were sold to McNulty in December 1942. It has not been used exclusively as a textile mill since 1934.
11. As originally designed and constructed, and prior to the time the property was leased to the United States in May 1943, a railroad siding extended over an embankment to the rear of the main buildings and behind the storehouse and pickerhouse. There was a coalshed (building No. 11) , 223 feet by 40 feet, extending south from building No. 10, and there were two rail lines into the coalshed leading from the New York, New Haven & Hartford line. The sidings left the New York, New Haven & Hartford line approximately where Broad Street crosses the line, curving east and northeast, and then around the buildings, increasing in elevation on the natural embankment, passing the storehouse at its third level, the third level then being platform height, and north of the storehouse being carried on a trestle to the coalshed mentioned above.
A narrow road was cut into the property from a point where Broad Street and Mill Street connect and that road passed under the trestle. There was no access to the interior of the yard east of the main building except by a narrow roadway which extended between the storehouse and building No. 6. There was a narrow road leading from Study Hill Avenue to the front or west side of the property, passing south of building No. 2 and serving an elevator at tailboard height on the east side of building No.- 6. That was the only access to the interior of building No. 6 except from Study Hill Avenue which paralleled buildings Nos. *182 1 and 2 on the west. There was no siding on the property except the siding in the rear near the coalshed (No. 11) and the pickerhouse and storehouse. There were no sidings and no platforms in the front of the main mill buildings or in the immediate rear of the main mill buildings.
In the operation of the property as a cotton mill, supplies and materials were shipped to the plant by rail and unloaded on the siding in the rear of the storehouse and pickerhouse. ■The cotton which was received from freight cars was unloaded on the siding and moved into the building known as the storehouse by two-wheeled trucks and was raised or lowered on a hoist to the other floors. Since the plant had been designed and constructed in 1886 and 1901, “more or less in the horse and buggy age,” it was not possible originally to get around to the back of the buildings with trucks because the buildings and facilities were designed for horses and wagons.
There was an open bridge or passageway connecting the north end of the storehouse with the south end of the picker-house, with 8-foot clearance above ground level. A covered bridge or passageway connected building No. 1 and the upper level of the pickerhouse, and there was also an open bridge or passageway connecting the storehouse with building No. 2.
12. In December 1942, the Lonsdale Company, then owned by Textron, Inc., conveyed the premises to McNulty for a consideration of $65,000.
13. Some time prior to May 22, 1948, when the premises were leased to the United States by McNulty, the textile machinery and equipment were sold by the Lonsdale Company and were removed from the premises. The removal of the machinery left numerous slits, holes and openings in the first floor of the main mill buildings which had been provided for the machine belts connecting the machinery to the drive shafts below the first floor. The openings were in groups of three or four per 50-foot bay, and were % to % inches wide and 4 to 6 inches long.
14. The mill buildings had a total area of 442,304 square feet of floor space.
*183 15. At the beginning of the defendant’s tenancy, there were four elevators in the mill buildings, one in each of the three towers on the east of buildings Nos. 1 and 2, and one in building No. 6. None was in operating condition, and two had no hoisting mechanism other than the platform.
16. The basement of building No. 1 was about 50,000 square feet in area. There was a concrete strip or runway about 15 feet in width running from the south end of the building to a small room where yarn had been treated by steam. The balance of the ground area was of dirt and sand, merely permitting access to the shafting. The ceiling Was just high enough to allow the maintenance men to repair the belting and oil the shaft. A part of this basement area had sand piled within two or three feet from the joists supporting the first floor.
17. While the general condition of the mill buildings was fair to good in 1943, considering the non-use since 1934 and considering the age of the buildings, the following references concerning condition are pertinent.
The condition of the floors was fair to good throughout the plant.
The wiring was the old-fashioned knob and tube wiring for lighting. Since power for the mill operation had been from steam produced from boilers at the plant, there was no provision for electrical power other than lighting.
There were five upright boilers in the boilerhouse (No. 5) and two auxiliary upright boilers in the powerhouse (No. 10), all of which were in a deteriorated condition.
Several hundred window panes needed replacement.
The surface water from buildings and surrounding premises was drained by an open trench which extended along the west of buildings Nos. 1 and 2. These were connected to slushways that ran to sewers in front (west) of the buildings, discharging into the Blackstone River farther to the west. Originally the drain was lined with asphalt or tar, and it sloped only three or four inches but it did drain the surface water away from the buildings.
18. Since the greater portion of the plaintiff’s claim is concerned with alterations made to the storehouse and the pickerhouse, they will be described in some detail.
*184 STOREHOUSE
This is a three-story and basement (or ground floor) building, 150 feet by 50 feet, of heavy brick construction, with a stone base on the south and east sides. The walls are 24 inches thick at the ground floor, 30 inches thick at the first floor, 16 inches thick at the second floor, and 12 inches thick at the third floor.
It was designed and constructed for use as a cotton storehouse, and in May 1943 this building did not have an elevator but was equipped with a whip hoist. No provision was made for heat in the storehouse, and while a sprinkler system had been installed, it was a “dry” system because the building was unheated. One stairway served all floors. The lighting, while adequate for an old-fashioned cotton storehouse, was inadequate for modern industrial use. The building did not have windows but there were small openings approximately 26 inches wide in the walls, and the openings were covered by sheet iron shutters. The electrical wiring was the old-fashioned knob and tube wiring and there were drop lights.
The floors were low-studded, having clear ceiling heights of 9 feet 51/2 inches, 7 feet 5% inches, 7 feet 514 inches, and 8 feet 1 inch, respectively. The floor of the basement was paved with asphalt. The floors of the upper stories were of plank construction for the subflooring, with a maple top floor. There was evidence of some breakage of the top flooring in May 1943, but the subflooring was in good condition. Also, the evidence establishes that the floors in place in May 1943 were the original floors placed in the building when it was constructed in 1901.
The upper floors were supported by wooden posts or columns on 10-foot centers. There were 30 posts on each floor which supported the floor above.
In May 1943, access to the storehouse was obtained over a narrow dirt road, too narrow for large trucks to traverse. There was no doorway on the east end at lower level but there was a doorway on the west, and the spur track or siding was on the east side of the building. There was a platform on the east side where freight cars were unloaded *185 and there was a doorway into the building on the third floor level.
The storehouse was connected to the pickerhouse by an ■open passageway.
In 1943 the storehouse provided a total of 30,000 square feet of space.
PICKERHOUSE
This is a two-story and basement building, 113 feet by 72 feet, of heavy brick construction. The walls are 24 inches thick at the ground floor, 20 inches thick on the second floor, -and 16 inches thick on the upper floor.
The pickerhouse was designed for use as the first stage in the cotton milling process and was constructed in 1901; In May 1943, this building did not have an elevator; It was heated by coil pipes, the steam being supplied from the main boilerhouse. One stairway served all floors. The sprinkler system was not in operation. The floors were low-studded, having clear ceiling heights of 7 feet 5 y2 inches, 10 feet 5y2 inches, and 12 feet 10 inches, respectively. The ■electrical wiring was the old-fashioned knob and tube wiring, with drop lights. The upper floors were supported by 33 wooden posts or columns on each floor. The columns were placed on 18-foot centers along the width of the building ■and 9-foot centers along the length of the building on each floor.
In May 1943, there were 16,272 square feet of usable floor space in the pickerhouse. The first or ground floor was a •dirt floor or cellar. The upper floors were of plank construction, with a maple top flooring. There was some evidence of breakage of the top flooring in May 1943, but the subflooring was in good condition. The evidence establishes that the wooden flooring in place in May 1943 was the original flooring installed in the building when it was constructed in 1901.
In May 1943, the pickerhouse had a small door on the south side and there was a passageway or open bridge from the storehouse to the pickerhouse. That bridge cleared the grade at the pickerhouse end of the bridge at approximately eight feet above the ground. There was also a bridge from the pickerhouse to the main building but there was no *186 access to the pickerhouse by large trucks, and no vehicle exceeding eight feet in height could pass under the bridge between the pickerhouse and the storehouse.
19. After commencing occupancy under the lease on May 22, 1943, the United States let a contract to the Dahlstrom Company, a private corporation, which agreed to convert the premises to a construction equipment repair depot for the repair and rehabilitation of Navy-owned equipment and to make repairs to such equipment on a cost-plus-a-fixed-fee basis. In carrying out the provisions of that contract, the Dahlstrom Company caused a number of changes, alterations and installations to be made to the premises. All of the costs for the rehabilitation and conversion of the premises for use as a construction equipment repair depot were paid by the defendant.
20. After the contract with the Dahlstrom Company terminated, the Department of the Navy took over the direct operation of the premises.
21. During the existence of the tenancy, the Department of the Navy or its contractor, the Dahlstrom Company, made changes, alterations and additions costing a total of $558,342.74. The changes, alterations, and additions included the following:

Subcontractors (On Purchase Orders')

Installation of Lighting and Switch Outlets- $716. 00
Power and Lighting Service, Installation of_ 23,849. 01
Rehabilitation of Bldgs. & Erection of Necessary Office Partitions- 9,388. 00
Construction of Parts Bins & Walkways (Whse)_ $17,760.00
Construction of Concrete Record Vault_ 3,862. 68
Erection of Loading Platform and Ramp_ 22,503. 00
Installation of Sanitary Sewer and Manhole_ 1,087.60
Demolition of Coal Shed and Railroad Trestle_ 5, 500.00
Excavating and Grading— 3,758.63
*187 Subcontractors (On Purchase Orders') — Continued
Fencing Property_ 4,463.74
Construction of Spur Track & Extension of Bulk Track_ 2,863.33
Erect 22,000 volt line & two-pole sub-station & connect transformers_ 4,121.33
Manufacture & install cloth window shades in various offices_ 543.70
To make topographical survey of land for storage area-250.00
Laying out drives and drainage system on Equip., Storage Lot_•_ 292. 00
Installation of underground tanks and elec, gasoline pumps_ $215.25
* *
Rehabilitation of Present Plant_ 423,453.14
Office_ 10,570. 06
Parts Racks-29,773.31
Crane and Tractor House (the Storehouse)_ 24,728.41
Heat_ 11,712.79
Drives and Bridges_ 348.10
Fences and Gates_ 4,669.75
Sewer Line_ 3,340. 51
Power Line_ 28,751. 85
Water Line_ 5.627.13
Railroads_ 2.874.13
Removal & Demolition of Temp. Structures_ 12,493.56 - $558,342:74
22. It was after the expenditure referred to above that the plaintiff purchased the 12.3-acre tract, improved by the mill buildings, for $307,500.
23. Pursuant to special agreements executed by the plaintiff and the defendant on October 31, November 27 and December 11,1946, portions of the premises were surrendered by the defendant and accepted by the plaintiff, and the rental *188 for the remainder of the premises still under lease was adjusted proportionately. The first of such special agreements contained a provision for the reimbursement by the plaintiff to the defendant of the cost of utilities in the following terms:
It is further understood that Realty Associates, Incorporated agree to reimburse the Government for the cost of services of heat, light, power, water, and such additional services as may be requested by Realty Associates, Inc., as may be provided by the Government to the lessor in connection with the utilization of the above-surrendered space by the Realty Associates, Incorporated, after October 31, 1946, at the rates charged by utilities to the Government, where supplied by the utilities, and at reasonable value where supplied directly by the Government.
The second and third special agreements contained similar provisions, except that where the word requested appears in the above quotation the word required was substituted therefor.
24. Pursuant to a modification agreement executed by the plaintiff and the defendant on January 29, 1947, the remaining portion of the premises was surrendered by the defendant and accepted by the plaintiff as of January 31, 1947. By letter dated October 1, 1946, the plaintiff notified the defendant that it would require restoration of the premises in accordance with paragraph 8 of the lease. Upon termination of the lease and surrender of the premises, restoration was not made by the defendant.
25. On January 31, 1947,' the date on which the lease terminated, the physical changes in the mill buildings, including additions and improvements thereto as well as deletions and removals therefrom, resulted in a general betterment of such buildings and appurtenances over and above their state at the beginning of the defendant’s tenancy.
The condition of the premises and comments upon the effect of the changes made may be described as follows:
The embankment in the rear of the storehouse and to the south thereof which had been removed, together with the railroad siding which had extended over such embankment, were not in place. The trestle which had carried railroad *189 tracks from the end of the embankment at the storehouse to the coalshed or tipple near the powerhouse (building No; 10) was removed and not in place. The coalshed or tipple, which had prior to the defendant’s tenancy been 223 feet by 40 feet, was removed except for one section which was '27 feet by 40 feet. The new railroad spur line in the front of the main mill building (buildings Nos. 1 and 2) was in place.
The removal of the embankment made available space for a 25-foot roadway in the rear of the buildings which accommodated automobiles and trucks, providing access to buildings which could not be reached by large vehicles prior to May 1943.
The railroad siding was relocated so that it extended along the front or west side of buildings 1 and 2. The present location of the railroad spur line is much more useful to the mill buildings as a whole than the previous location was, since direct access is provided to the west of buildings 1 and 2 along a loading platform. The removal of the embankment did, however, leave a sharp slope from the roadway toward Broad Street for a distance of about 300 feet.
A section of heavy wrought iron fencing about 1200 feet long had been removed from the front or west side of the mill buildings. At the end of the tenancy, it was not in place.
The removal of the fence, which had been located on the western edge of parcel 1 (the 12.3 acres purchased by the plaintiff), about 50 feet from the face of buildings 1 and 2, permitted access (including the backing of trailer trucks) to the loading platform which serves the front of those buildings.
A 50-foot by 113-foot addition to the pickerhouse was erected on the east side thereof. This was constructed of corrugated sheet metal on structural steel frame with a concrete floor. It was a one-story structure with high ceiling and a floor area of 5,650 square feet.
The excavation of sand and dirt in the basement of building No. 1 and the placing of an additional 40,000 square feet of concrete floor rendered usable the entire 50,000 square feet of ground floor space in such basement.
Because of the removal of the embankment referred to earlier, certain changes were required in the sewer and drain *190 age system which were accomplished and which were in place at the end of the tenancy.
The sprinkler system and the heating system were overhauled by the defendant and placed in operation.
Two of the old boilers were overhauled and were in operation.
New power lines, electric lines and transformers were in place, and lighting was improved generally.
Main Mill Buildings Nos. 1 and 2. The loading platform, 300 feet by 20 feet, which had been constructed on the front of the main mill buildings, was in place. That platform had concrete footings and a heavy wooden deck and adjoined the new railroad spur. A 25-ton Fairbanks platform scale had been installed in the main building.
• Toilets had been installed in the main building as follows: In buildings 1 and 2, two sets of 12 fixtures each. In the towers there were two fixtures on each of the three floors. In building No. 2 there were four fixtures in the basement.
A ramp had been installed at the south end of the building from the driveway to the level of the floor of the basement of building No. 2.
Four large sliding service doors and doorways were installed in the main building providing access to the loading platform and other portions of the property.
Two steel I-beams had been installed beneath the first floor of building No. 2 and were supported by steel columns.
Two of the elevators had been repaired and were in operating condition.
■ Numerous window lights had been replaced. A wooden runway had been installed on the first floor of the main building extending from the elevator wall of building No. 1 to the last tower in building No. 2. This runway was installed to permit use of fork lift trucks which otherwise damaged the original floors.
The sand and dirt in the basement of building No. 1 were excavated and removed, thus enlarging the head room in the basement, and 40,000 square feet of 6-inch concrete was installed in the basement. This increased the usable space in the main mill buildings so that on January 31, 1947, there was a total of 478,512 square feet of usable floor space com *191 pared with, the 442,304 square feet of usable space in May 1943.
Heat, light and power were installed in the basement, and the sprinkler system was operating.
Storehouse. The three upper floors described in finding 18 were removed and the roof was supported by the installation of an inverted truss. On January 31, 1947, the walls, roof and structure were in good condition and are still in good condition, although no repairs have been made since that time.
A large rolling shutter door was installed. Unit heaters and high-powered lights were installed. The bridge which connected the storehouse and the main building had been removed to make room for the passage of equipment and trucks. In January 1947, the storehouse contained 7,500 square feet of usable space.
Pickerhouse (No. 3). The two upper floors described in finding 18 were removed and the roof was supported by the installation of an inverted truss. On January 31,1947, the walls, roof and structure were in good condition and are in good condition today even though no repairs have been made. Two large rolling shutter doors were installed. New electrical circuits and wiring were installed. The ground floor was paved with concrete, and a concrete apron.was installed in front of the pickerhouse. An additional building was constructed on a concrete floor, 50 feet by 113 feet, adjoining the pickerhouse. This building was made of welded corrugated iron, and provided an additional 5,650 square feet of space. On January 31,1947, there were 8,136 square feet of usable space in the pickerhouse itself.
Boilerhouse (No. 5). Five old boilers were removed, making available 3,612 square feet of usable space. A spray hood and two large rolling doors were installed. Part of the yard north of the boilerhouse was paved with concrete. The floor was leveled and paved.
Cloth Boom (No. 6). At the end of the cloth room, from the basement level, which is about equal to tailboard height in the driveway, a lift nine feet square was installed. Three toilet fixtures were installed.
*192 Other Buildings. The other buildings were substantially unchanged as compared with their 1943 condition.
26.The premises have not been restored to the condition they were in on May 22, 1943, nor have they been used exclusively for a textile mill since 1934. - However, plaintiff has made improvements and repairs, at the costs where shown, as follows:
Installed heating plant and boiler to maintain property and furnish heat and power to tenants efficiently.
Partitioned walls, making separate manufacturing plant space available.
Installed toilets.
Installed partitions and floors in main building.
Installed elevators.
Constructed retaining wall_ $465. 00
Blocked holes in pickerhouse- 135. 00
Repaired breakage in basement floors_ 1,610. 00
Installed storm sewers_ 3, 000. 00
Regraded roads_ 260. 00
Surfaced roads_ 10,700.89
Repairs to flooring_ 2, 500. 00
27. During the tenancy by the defendant, neither the plaintiff nor its predecessor in title made any repairs to the premises.
28. The plaintiff has leased portions of the premises to a number of different tenants who are engaged in diversified industry, such as weaving, dyeing, bleaching, paper manufacturing and steel fabricating. Other portions of the premises have been leased for storage. The premises now are 100 percent rented and produce a gross return of $150,000 per annum in their present unrestored condition but as improved by the improvements described in finding 26.
29. On May 22, 1943, the highest and best use to which the premises were adapted was no longer their original use, namely, as a textile mill, but the highest and best use at that time was for multiple tenancy by diversified industries.
30. On May 22, 1943, before any changes had been made in the premises by the defendant, the fair market value of all the mill buildings and the 12.3 aeres of land on which they stood was $125,000.
*193 31. On January 31,1947, the highest and best use to which the premises were adapted was for multiple tenancy by diversified industries.
32. The evidence establishes that due to general economic trends extending over a period dating back to the depression ■ years of 1932 to 1934, the cotton milling industry and the textile industry generally have migrated from the New England area to new industrial locations in Southern States. The evidence further establishes that because of the change in economic conditions in the textile industry, and because of the nature and character of the premises involved in this case, it would not be economically feasible to actually restore• the Ann & Hope Mill to the condition that existed on May 22, 1943. It would be an economic waste to make actual restoration by removing the 300-foot loading platform which, was constructed in the front of the main mill buildings Nos. 1 and 2; to restore the iron fence which was removed; to restore the embankment in the rear of the storehouse; to replace the railroad siding which originally extended over that embankment; to restore the narrow roadway suitable only for horses and wagons in place of the wide road which was made possible by the removal of the embankment in the - rear of the storehouse; to remove the large rolling shutter doors which were placed in the storehouse, the pickerhouse, , and the old boilerhouse; and to remove the addition which was constructed adjoining the pickerhouse.
It has been 15 or 20 years since there has been any use or-real demand for buildings such as the storehouse or the pickerhouse, for the use to which they were originally put.
Neither the storehouse nor the pickerhouse would be suitable for modern use without the installation of numerous additional facilities which were not in the buildings originally and were not in the buildings in 1943. For example, both buildings, to be adapted for modern use, would require elevators, modern lighting, proper heat, windows, and suffi--ciently high ceilings, instead of the low-studded ceilings and floor space cluttered by frequently spaced supporting - columns.
33. It is not shown by clear and convincing evidence that. within the foreseeable future such erosion will take place- *194 on the slope between the roadway to the east of the storehouse and Broad Street which would undermine Broad Street or the adjoining sidewalk.
The parties stipulated that the cost of (1) restoring the embankment adjacent to Broad Street on the east side of the storehouse, (2) reconstructing the railroad trestle, and (3) replacing the railroad spur line on the embankment and trestle, would exceed the cost of a retaining wall to shore up the embankment as excavated and facing the storehouse rock foundation with concrete. A further stipulation was made that the location of the railroad spur line on the west side of the main mill building, as well as the roadway adjacent to the east and south of the storehouse, are more useful to the present purposes of the property than the location of the spur line where it was at the beginning of the Government’s tenancy.
34. On January 31, 1947, the fair market value of the premises, consisting of the 12.3 acres together with buildings, in the condition as altered and improved by the Government, for their highest and best use. was between $310,000 and $325,000.
35. If the premises had been in the same condition on January 31, 1947, as they were on May 22, 1943, except for ordinary wear and tear, the fair market value of the premises for their highest and best use on J anuary 31,1947, would have been $200,000.
36. The foregoing valuations of the property were made in accordance with the customary appraisal practice of valuing the property as a unit and not by valuing the various buildings separately.
37. However, in relation to the remainder of the property and provided that 15,000 to 20,000 square feet of adjoining land were made available for access by trucks, on May 22, 1943, the fair market value of the storehouse, for its highest and best use, before the floors were removed, would have been $15,000.
38. If the three upper floors of the storehouse had been restored in January 1947 to the places from which they had been removed by the defendant, the increase in fair market *195 value over and above tlie value of that building in tbe condition in which it had been returned to the plaintiff in January 1947, would have been not more than Six Thousand Dollars ($6,000).
39. In relation to the remainder of the property and provided that adjoining land were included for suitable access, on May 22, 1943, the fair market value of the pickerhouse, for its highest and best use, would have been $12,000.
40. If the two upper floors of the pickerhouse had been restored in January 1947 to the places from which they had been removed by the defendant, the increase in fair market value over and above the value of the building in the condition in which it had been returned to the plaintiff in January 1947, would have been not more than Six Thousand Dollars ($6,000).
. 41. At the beginning of the defendant’s tenancy, the main mill building was equipped with approximately 450 storm sash. At the end of the defendant’s tenancy, 75 of these storm sash were returned to the plaintiff. There is no direct evidence regarding the age or condition in 1943 of the 375 storm sash which were not returned to the plaintiff. It is found from all of the evidence that the failure to restore 375 • sash of uncertain age and condition detracted from the value of the main mill building in January 1947 not more than Five Thousand Dollars ($5,000).
42. Plaintiff engaged a qualified architectural engineer, registered in the State of Khode Island, who made a detailed study of the storehouse and pickerhouse as they existed prior to removal of the floors. Using a drawing of the plant prepared by the Factory Mutual Insurance Company, Navy Department drawings, and on the basis of personal examination of the buildings, this architectural engineer prepared construction plans for restoration of the identical floors, stairs, and facilities in existence at the commencement of the lea,se. These plans also include design for a retaining wall to hold the embankment adjacent to Broad Street and concrete facing for the foundation of the storehouse exposed by the Navy’s excavation of the embankment.
*196 These plans were furnished to contractors familiar with mill construction in the vicinity. Three contractors experienced in industrial construction calculated the present cost of carrying out these restoration plans as follows:
Henry M. Soule (Soule Construction Co.)-$220,886
Alvin B. Conway (Bowley Construction Co.)_ 234,079
Carl W. Bupprecht (Gilbane Building Co.)__ 240,127
43.The first bid was broken down into the following items:
Betaining wall to support bank on east of buildings- $43,013
Iron picket fence- 16,680
Beplacing 450 storm sash- 33,750
Bridge between pickerhouse and storehouse_ 2,635
Foot bridge- 1,706
Pickerhouse restoration_ 59,428
Storehouse restoration- 63,674
220,886
44. Pursuant to the supplemental agreements mentioned in findings 23 and 24, the defendant surrendered the portions of space described on the dates specified in those agreements and furnished heat and other utilities to that space. In accordance with the tenor of those agreements, the defendant deducted the cost of furnishing the utilities from the modified amount of rental due for the months of October, November, and December, 1946, and January 1947, and tendered its voucher and a United States Treasury check in the sum of $317.67 in payment of the balance due for rental for those months.
45. The plaintiff refused to accept the tender and returned the check to the Department of the Navy which had transmitted it.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover, and it is there *197 fore adjudged and ordered tbat it recover of and from the United States twenty thousand eight hundred forty nine dollars and eighty four cents ($20,849.84).